CHARLES HODGKINS *vs.* GEORGE A. CHAPPELL & another.

Essex. Nov. 5, 1879. — Jan. 20, 1880. COLT & AMES, JJ., absent.

On the issue whether an oral contract, made by A. with B. acting for a firm of which he was a member, was one of sale or of consignment for sale, a letter written by B. to his partner, in which, after the contract was made, he stated its terms, is inadmissible in behalf of the firm.

In an action for the price of a lot of frozen fish, the defendant contended that they were worthless, and had been thawed and frozen several times while in the plaintiff's possession, and put in evidence of the state of the thermometer during this time. *Held,* that the plaintiff might in rebuttal put in evidence that other fish of a similar description stored in the same place for the same time did not thaw, and were taken out afterwards in good condition.

No exception lies to the order in which evidence at the trial of a case is allowed to be put in.

CONTRACT upon an account annexed for goods sold and delivered. Answer, a general denial. Trial in the Superior Court, before *Gardner*, J., who allowed a bill of exceptions, in substance as follows:

The plaintiff offered evidence tending to show that, on February 17, 1872, he met, in Boston, one Storer, one of the defendants, who are partners doing business in the city of New York, and told him that he had in Rockport thirty boxes of codfish which were frozen up when new, which he wished to sell; that, in reply to Storer's question how they looked, he said, "Pretty good," and that he would sell them for $2.50 per cwt.; that Storer then told him to put on the cars ten boxes, and mark five of them "Chappell & Storer," and five of them "W. Pearsall & Co.," saying that the defendants had two stalls in the market in New York, and those were the names under which the business was done; that accordingly he forwarded the ten boxes that day, directed as ordered, and on Monday following met Storer in Boston again and informed him that they were shipped; that Storer then said, "To-morrow we'll see about the rest;" that on Tuesday he met him again, and Storer then told him he had received a telegram from his partner, and instructed the plaintiff to send on the rest, which he did when he returned to Rockport that night; that the rest consisted of six boxes, which were sent marked as before, half to the defendants by name, and half to

Pearsall & Co.; that on Wednesday he met Storer again, who said to him, " They 've rather gone back on those fish ; but we 're all right and you are all right, the wagon-boys will have them Thursday ; " that the fish were caught and purchased by the plaintiff in November, and were frozen when fresh caught, and had not been thawed ; and that he sent a bill of parcels by mail when he sent the fish.

The defendants offered evidence tending to prove that the interviews between the parties were substantially different; that the plaintiff told Storer that he had some hard-frozen fish which he could not dispose of in Boston, and asked if Storer could not dispose of them in New York ; that Storer told him to send on a few boxes and he would write to his partner, so that he would get the letter when he got the fish ; that not a word was said about price, or about sending any to Pearsall, or about a purchase of the fish by the defendants, but only about a consignment of them for sales and returns ; that the next day he received a telegram from his partner, which he communicated to the plaintiff, to this effect: " Have sold all the fish, tell Charlie to send on the rest; " that at this time nothing was said about price, or about a sale, or about any other bargain than the first; that on the next day he received another telegram from his partner, which he also showed to the plaintiff, to this effect: " Tell Hodgkins not to send the fish, the others were rotten and worthless; " that the plaintiff said he had already sent them, and that the defendants must do the best they could for him, to which Storer replied that he would write his partner to that effect, and did so ; that no bill of parcels was forwarded with the fish, or until two or three years afterwards; that all the fish which came, came directed to them, and they never knew of any coming directed to Pearsall, with whom at that time they had no connection; that, on the arrival of the first lot, they were at once sold, some of them before they were taken from the cart; that some were sold to retail dealers in New York, and some to retail dealers in Newark, New Jersey; that on the same day, but after the first telegram had been sent to Boston, they were all returned as rotten and worthless; that those which were sold in New York were seized by the sanitary police and brought back to them, and nearly all of them were destroyed as utterly worthless and inju-

rious to the public health; that some few small lots which were sold were not returned; and that an account of sales, in which the plaintiff was credited with the amount received, and charged with freight and expenses, and showing a small balance due the defendants, was forwarded to the plaintiff at once, to which no reply and no objection were made for several years. The receipt of such account was denied by the plaintiff.

The defendants also introduced evidence tending to show that these fish had been exposed to great changes of weather, and, specifically, evidence of the state of the thermometer every day from November to February; that their condition, when received in New York and thawed, showed that they had become tainted and spoiled before they were frozen at all, and that they had been thawed more than once after they were first frozen; and that they were not, when sent to New York, in any respect merchantable or suitable for human food, but were tainted, rotten, and utterly worthless. It was agreed that Storer never saw the fish before they were sent to New York.

The defendants showed that, after the first conversation between the plaintiff and Storer, the latter wrote a letter to his partner in New York in relation thereto, after the receipt of which and the fish, Chappell sent the first telegram; that in the letter Storer informed him of the terms on which the plaintiff was to send the fish; and, after proving that this letter had been destroyed by fire, offered to prove its contents. But the judge, upon the plaintiff's objection, refused to admit evidence of the contents of the letter, although finding as a fact that the original was destroyed; and the defendants excepted.

In reply to the defendants' evidence, the judge permitted the plaintiff to testify, against the defendants' exception, that the fish were kept in a certain shed in Rockport, from November to the time they were sent to New York; that, during this time, other fish, bought at the same time as these and of a similar description, were also kept there, which were put in at the same time; and that these other fish so kept there did not thaw during the time specified, but were taken out in the spring in good order and condition.

The plaintiff contended that the defendants had accounted for only half of the fish sent; and that, of the other half, no evi-

dence was given by the defendants of their condition. The plaintiff put in evidence, against the defendants' exception, the testimony of the Eastern Railroad Company's freight agent at Rockport, who, after referring to his books to refresh his memory, testified that, on February 17, 1872, there were shipped from Rockport five boxes of fish marked " Chapparel & Storer, New York," and five marked " W. Pearsall, New York," and on February 20, 1872, three boxes marked to each of the same con·signees. The books were examined by the defendants, were in the handwriting of the witness, and did not contain the name of any consignor or shipper; and the witness, on cross-examination, said that he could not testify that the plaintiff had anything to do with these shipments, but merely that goods so marked were forwarded on those dates. It appeared by said books, (which were not offered in evidence,) that no other fish were shipped from Rockport to the defendants or to Pearsall during that month.

The jury returned a verdict for the plaintiff for the full amount claimed ; and the defendants alleged exceptions.

*S. B. Ives, Jr.*, for the defendants.

*C. P. Thompson*, for the plaintiff.

LORD, J. It is entirely obvious that the real question in controversy in this case was the comparative credibility of the plaintiff and of the defendant Storer, and this fact made it the more important that the independent testimony sustaining the view of one side or the other should be carefully scrutinized and kept within strictly legal limits. We are unable to see that in this respect there was any error.

1. The first point made by the defendants is that the letter from Storer to Chappell should have been admitted in evidence, and their claim is, that it should have been regarded either as part of the *res gestœ*, or as a part of a correspondence of which the telegram was the other part, which telegram was communicated to the plaintiff. What *res gestœ* it was part of, the defendants do not explain to us. It was not a part of the contract between the plaintiff and the defendants, for both parties agree that the contract for the first lot of fish, whatever it was, had been fully made and completed between the parties before the letter was written. It was simply the declaration of one of the defend

ants to his co-defendant, in the absence of the plaintiff, and without the plaintiff's knowledge. Nor does it appear to be any part of any correspondence which was put into the case. The plaintiff did not introduce the telegram in evidence. He simply testified that Storer told him he had received a telegram in consequence of which he concluded to purchase the remainder of the lot of fish. When the defendant Storer testified, he produced the telegram; but there is no reference in the telegram to his letter to his partner, nor does it appear that the plaintiff ever did have or ever could have had any knowledge of the contents of such letter, or that any letter had been written from one partner to the other; and the admission in evidence against him of the private conversation or correspondence between the defendants would be in violation of his rights.

2. The next point made by the defendant is that the evidence of the condition of other fish, though bought at the same time and kept in the same place, for the same period, was incompetent, as irrelevant and collateral.

In examining the validity of this objection, it is important to understand at what stage of the case and under what circumstances this evidence was admitted. The plaintiff in chief had offered nothing as to the particular condition of the fish, nor the temperature in which they had been kept. The defendants in their defence introduced evidence " tending to show that these fish had been exposed to great changes of weather, and, specifically, evidence of the state of the thermometer every day from November to February; that their condition, when received in New York and thawed, showed that they had become tainted and spoiled before they were frozen at all, and that they had been thawed more than once after they were first frozen." And the bill of exceptions states in terms that it was " in reply to the defendants' evidence " that the court permitted the plaintiff to testify that the fish " were kept in a certain shed in Rockport, from November to the time they were sent to New York; that, during this time, other fish, bought at the same time as these and of a similar description, were also kept there, which were put in at the same time; and that these other fish so kept there did not thaw during the time specified, but were taken out in the spring in good order and condition."

The evidence was not offered for the purpose of proving the other fish to be good; that matter was wholly immaterial and collateral; but it was offered for the purpose of meeting the defendants' testimony, and of showing that it was not true, by showing such a state of the temperature of the place where they had been stored as to render the thawing, which had been testified to by the defendant, improbable, if not impossible. We presume that the record of the thermometer of which the defendants testified was made at Rockport, and perhaps in the immediate vicinity of the fish; but temperature by the thermometer is not determinable except by its influence upon mercury or spirit, and those are not the only substances upon which temperature has an effect, and we see no reason why the condition of temperature may not be determined by its influence upon other materials. The evidence, therefore, was competent and pertinent to meet the exact state of facts which the defendant had put in evidence.

3. The third exception taken by the defendant is to the admission of the testimony of the Eastern Railroad Company's freight agent, who was permitted to testify that, on February 17, 1872, five boxes of fish were shipped from Rockport marked " Chapparel & Storer, New York," and five marked " W. Pearsall, New York," and on February 20, 1872, three boxes marked to each of the same consignees. The principal objection made to this testimony by the defendant seems to be that it was admitted at an improper stage of the trial. It does not seem to be seriously contested that the evidence would not have been competent as a part of the plaintiff's original case, as being one step in the proof of a sale and delivery. . But whether it should be admitted at a later stage was entirely within the discretion of the presiding judge. In this case, it is contended that the evidence, especially as introduced at the time it was, would necessarily tend to the corroboration of the plaintiff's case, upon which the plaintiff had no right to offer corroboration, and which the facts proved had no legitimate tendency to corroborate. It is not improbable that this may be so. It was, however, within the power of the party to have asked specific and careful instructions as to the purposes for which it was admissible, and how far it could be used in support of the plaintiff's case, and what uses of it were improper or

incompetent. But it does not appear by the bill of exceptions that any such instructions were asked, nor does it appear that full and ample instructions were not given, nor that the uses and purposes of the evidence were not exactly limited and qualified.

*Exceptions overruled.*